## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JOHN BROE,

                                      :

      Petitioner,                          Case No. 1:05-cv-025

                                    :        District Judge Susan J. Dlott
     -vs-                                 Chief Magistrate Judge Michael R. Merz

ERNIE MOORE, Warden,

                                          :

      Respondent.

---

## REPORT AND RECOMMENDATIONS

---

This habeas corpus case under 28 U.S.C. § 2254 is before the Court for decision on the merits.

Petitioner John Broe was convicted by a Hamilton County jury of two counts of aggravated murder and one count of tampering with evidence.  The trial court sentenced him to consecutive life sentences with parole eligibility at twenty years on the aggravated murder counts and five years on the tampering with evidence count.

Petitioner raises the following grounds for habeas corpus relief:

      **Ground One:**  Trial court erred in overruling Defendant's motion to suppress evidence of his statements to police.

      **Supporting Facts:**  A statement is no longer voluntary when the State fails to scrupulously honor a defendant's right to stop the interrogation.

      **Ground Two:** Trial court erred in denying Defendant's motion for mistrial – hearsay testimony from a witness.

-1-

**Supporting Facts:**  The trial court abused its discretion in denying a mistrial or a curative instruction after the State deliberately elicited hearsay evidence from the victim's mother on several vital points.

**Ground Three:**  Trial court erred to Defendant's prejudice in admitting expert opinion evidence about cause of death of victim's fetus.

**Supporting Facts:**  An expert may not render an opinion which is not based on facts either perceived by him or admitted into evidence.

**Ground Four:** Trial court erred by denying counsel's motions for aquittal [sic] and accepting verdicts of guilty unsupported by evidence.

**Supporting facts:** The evidence presented below was insufficient as a matter of law to establish beyond a reasonable doubt that Defendant caused the unlawful termination of a pregnancy.

**Ground Five:**  Trial court erred to Defendant's prejudice in denying a mistrial in response to repeated acts of prosecutorial misconduct which prejudiced the jury.

**Supporting Facts:**  (A) Deliberate introduction of inadmissible hearsay was so prejudicial that a mistrial was the only remedy to insure Defendant's due process rights.  (B) The trial court should have granted a mistrial or curative instruction when the prosecutor informed the jury that instructions on self-defense and manslaughter were only being given because they were requested by Defendant.

**Ground Six:**  Defendant was denied the effective assistance of counsel by errors in closing argument and jury instruction.

**Supporting Facts:**  Counsel prejudiced Defendant's case by misstating the burden of proof to the jury and failing to object to an incorrect and prejudicial jury instruction.

**Ground Seven:** The trial court erred to the Defendant's prejudice by imposing a maximum consecutive sentence.

**Supporting Facts:** The record does not support imposition of maximum, consecutive prison sentences on this Defendant.

(Petition, Doc. No. 1, at 5-6A.)

While there is a one year statute of limitations for cases under § 2254, Respondent does not raise any claim that the Petition here is untimely.  Also, § 2254 requires that a habeas petitioner exhaust available state court remedies before filing in federal court, but Respondent does not assert that Petitioner has failed to exhaust available remedies.

Indeed, Respondent raises only one affirmative defense, asserting that the seventh ground for relief is procedurally defaulted by Petitioner's failure to present it to the Ohio Supreme Court on direct appeal (Return of Writ, Doc. No. 3, at 10-11).  Petitioner has made no reply to this argument.

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749(1991); *see also Simpson v. Jones,* 238 F. 3rd 399, 406 (6th Cir. 2000).  That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982).  Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982);  *Wainright v. Sykes*, 433 U.S. 72, 87 (1977).  *Wainright* replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

Failure to raise a constitutional issue at all on direct appeal is subject to the cause and

prejudice standard of *Wainwright v. Sykes*, 433 U. S. 72 (1977). *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Mapes v. Coyle,* 171 F. 3rd 408, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985). Failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> . . . .
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,* 785 F.2d, at 138.

The applicable state procedural rule here is the Ohio criminal *res judicata* rule which

provides that a claim which could have been raised on direct appeal and is not thus raise is barred from further consideration in the state courts.

> 7. Constitutional issues cannot be considered in postconviction proceedings under Section 2953.21 et seq., Revised Code, where they have already been or could have been fully litigated by the prisoner while represented by counsel, either before his judgment of conviction or on direct appeal from that judgment, and thus have been adjudicated against him. ...
>
> 9. Under the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was *raised or could have been raised by the defendant at the trial*, which resulted in that judgment of conviction *or on an appeal* from that judgment.

Syllabus in *State v. Perry*, 10 Ohio St. 2d 175, 226 N.E. 2d 104 (1967)(emphasis *sic*.).  *See also State v. Cole*, 2 Ohio St. 3d 112, 443 N.E. 2d 169, 170 (1982);  *State v. Duling,* 21 Ohio St. 2d 13, 254 N.E. 2d 670 (1970).

The *Perry res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state rule. *Mason v. Mitchell,* 320 F.3d 604, 628 (6th Cir. 2003); *Coleman v. Mitchell,* 268 F.3d 417, 429 (6th Cir. 2001); *Buell v. Mitchell,* 274 F. 3rd 337 (6th Cir. 2001); *Byrd v. Collins,* 209 F.3d 486, 521-22 (6th Cir. 2000), *cert. denied,* 531 U.S. 1082 (2001); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994); *Van Hook v. Anderson*, 127 F. Supp. 2d 899 (S.D. Ohio 2001).

In this case Petitioner raised his seventh ground for relief on direct appeal to the Ohio Court of Appeals for the First District, but did not raise it when he further appealed to the Ohio Supreme Court.  (Compare Assignment of Error 7, Appellant's Brief, Exhibit C to Return of Writ (Doc. No. 3) at 14 with Memorandum in Support of Jurisdiction, Exhibit G to Return of Writ.)  Without doubt, Petitioner could not now raise that claim in the Ohio courts because he failed to continue to raise it

-5-

on appeal to the Ohio Supreme Court.[1]  Therefore, the seventh ground for relief is procedurally defaulted.  Since Petitioner has presented no argument to show cause and prejudice for the default, his seventh ground for relief should be dismissed on the merits.

With respect to the other six grounds for relief, Respondent concedes that they were properly raised in the state courts and thus may be considered on the merits in this Court.  The Court proceeds to do so *seriatim*.  Because Petitioner filed no memorandum of law with his Petition and no reply to the Return of Writ, the Court relies for his argument on the brief which was filed on his behalf in the state court of appeals.

### Ground One: Asserted *Miranda* Violation

In his first ground for relief, Petitioner asserts that the trial court should have suppressed his statements to the police because he had invoked his right to counsel.

As noted above, this was the first assignment of error which Petitioner raised on direct appeal[2].  The decision of the Court of Appeals is reported at *State v. Broe,* 2003 Ohio App. LEXIS 2728 (1ˢᵗ Dist. June 13, 2003), *appeal denied,* 100 Ohio St. 3d 1431, 797 N.E. 2d 511 (2003).  On this question, Judge Painter wrote:

VI. John's Motion to Suppress

[*P24]  In his first assignment, John challenges the trial court's

---

[1]It appears that the decision to omit the claim was deliberate in that Petitioner was represented by the same counsel at the appellate and supreme court levels.

[2]In the first assignment of error, Petitioner asserted two reasons for suppressing his statements, only one of which – his asserted invocation of his right to counsel – is asserted here.

denial of his motion to suppress. Specifically, he argues that he was depressed and medicated, and that questioning improperly continued after he had requested to leave and after he had inquired about counsel. Before his trial, John had moved to suppress any statements that he had made to the police, as well as any evidence seized as a result, contending that he had not been properly told of his Miranda rights and that the interrogations were improper. The trial court denied his motion, finding that John had been properly advised of his Miranda rights and that he had knowingly, intelligently, and voluntarily waived them.

[*P25]  As a reviewing court, we must give great deference to the trial court's findings of historical facts when responding to a challenge to a ruling on a motion to suppress. n1 We must "independently determine, as a matter of law, however, whether the facts meet the appropriate legal standard." n2 Further, "under Miranda v. Arizona, n3 the state may not use incriminating statements made during a custodial interrogation unless it proves that procedural safeguards resulted in the defendant's voluntary waiver of his constitutional privilege against self-incrimination. * * * Where a defendant is entitled to these procedural safeguards, or Miranda warnings, and the state has failed to inform the defendant of his rights, any incriminating statements made during a custodial interrogation must be suppressed at trial." n4

n1 See State v. Spaulding, 1st Dist. No. C-020036, 2002 Ohio 4935, P6, citing State v. Mills (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.
n2 Id., citing Ornelas v. United States (1996), 517 U.S. 690, 696-699, 116 S. Ct. 1657, 134 L. Ed. 2d 911.
n3 Miranda v. Arizona (1996), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694.
n4 State v. Evans (2001), 144 Ohio App.3d 539, 551, 760 N.E.2d 909.

[*P26]  At the suppression hearing, Officer Bender testified that he was at John's home in response to a call by Nolan. When John arrived, Bender interviewed him about Shannon's disappearance, the state of their marital relationship, and the scratch on John's neck. According to the officer, John was not in custody and voluntarily showed  him and the other officers around his home. Miranda rights were not required, and, thus, suppression was not warranted for any statements John made at that time.

[*P27] Detective Steve Ventre testified that he had interviewed John when he voluntarily came to his office with Shannon's photograph. He asked John about his marital relationship and where he thought Shannon might have gone. John was not in custody, and Miranda warnings were not required. Thus, John's statements at this point need not have been suppressed.

[*P28] Police Specialist Roger Webster testified that he had located John at his place of employment for the purpose of getting him to submit to a polygraph examination to eliminate him as a suspect. John went voluntarily with the officer to the police station. He was placed in a room, and he was provided with his Miranda rights and stated that he understood them. He then took the polygraph examination. After the examination was completed, Officer Webster asked the homicide investigators if they wanted to speak to John. When they responded affirmatively, Webster asked John if he would mind answering some questions for the homicide investigators. John agreed to do so. Webster then took John to the interview room in the homicide unit.

[*P29] Cincinnati Police Officer Laurie Wobster accompanied Webster to pick up John. She observed some of the polygraph examination. She prepared a summary of a telephone conversation that she overheard John having while he was standing in a hallway outside the interview room and waiting for the homicide detectives to interview him. The statements overheard by Wobster were made in a hallway and without elicitation by police. They were not made in circumstances requiring suppression.

[*P30] Von Holle testified that he administered the polygraph examination. He first advised John of his Miranda rights. He ascertained that John was a college graduate. He then reviewed each of the rights with John and asked him to initial the notification-of-rights form before each stated right to indicate that he understood them. Van Holle testified that John had understood his rights and that he had waived them. Van Holle stated that he had made no threats or promises, that John had not requested an attorney, and that he had spoken voluntarily. He also told John that he was free to go at any time. John told him that he had not taken any medication or drugs. Von Holle then administered the examination. Van Holle explained that a notification about Miranda rights was provided to

-8-

everyone who took a polygraph test, whether the person was a victim, a suspect, or a witness.

[*P31]   Von Holle informed John that he had failed the test. Approximately 10 minutes later, John asked if he could leave. John walked out the door and asked if he could have a ride from one of the investigators. Van Holle responded, "Yeah. Have a seat in the lobby." Van Holle then spoke to another polygraph examiner who was outside the office. Someone then told the homicide investigators that John had failed the test. John was then taken upstairs. John had agreed to answer some questions, according to Webster.

[*P32]  Greg Ventre and Hoderlein were called in from a search for Shannon to interview John. They were told that John was willing to do an interview with them. Ventre ascertained John's degree of education and advised him again of his Miranda rights by reading them to him. John stated that he understood the rights and signed the waiver form. The officers then interviewed him for one and one-half hours before taking a break to provide John with a drink. Just prior to the break, John asked Ventre, "Should I have an attorney?" Ventre told him that it was not his place to advise him whether he should have an attorney, that John had advised him that he had understood his rights, and that if there were any part of his rights that John did not understand, Ventre would attempt to provide a clarification. According to Ventre, John never requested an attorney.

[*P33]   Once the interview started again, Ventre asked John if Shannon was someplace where she could be found. John wanted to know if that information would be an admission of guilt. John subsequently told the police where Shannon's body could be found and that he had killed her. He was told that he was not free to leave. Eventually another break was taken, and then John recorded his statement on tape. Ventre denied that John had been made any promises or had been threatened. He claimed that John had spoken voluntarily.

[*P34]  Officer Donald Feldhaus testified that he had been sent to find the shovel at John's place of business. He was holding the shovel at the police station when John was being led from the  interview room. When he asked John if it was the shovel that he had used, John told him, "No." John told him the shovel he had used was smaller and told him its exact location at the shoe store.

 [*P35]  As to the statements made at the police station, following the

failed polygraph examination, the evidence clearly showed that John had indicated that he was not medicated at the times he spoke with the police officers. The record fails to demonstrate that he was depressed to the extent that he could not voluntarily waive his Miranda rights. The record does show that John followed Von Holle's orders to sit and wait for the investigators when he asked for a ride from the police station after having failed the polygraph test. Even if we assume that John was not free to leave at that point, the record demonstrates that he had been provided with his Miranda rights and had waived them. Contrary to John's assertion, he did not invoke his right to remain silent by asking if he could leave and requesting a ride. He agreed to speak to the officers and voluntarily did so. Further, John's statement asking Ventre whether he should contact an attorney was not a clear and unambiguous request for an attorney. n5 Accordingly, because we find no error in the denial of his motion to suppress, we overrule John's first assignment.

n5 See State v. Revel, 12th Dist. Nos. CA2001-09-223 and CA2001-09-230, 2002 Ohio 4231, P15, and cases cited. See, also, United States v. Davis (1994), 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362.

*Id.* at **12-20.

The Supreme Court has recently elaborated on the standard of review of state court decisions on claims later raised in federal habeas corpus:

The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state-court convictions are given effect to the extent possible under law. See *Williams v. Taylor*, 529 U.S. 362, 403-404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). To these ends, § 2254(d)(1) provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

As we stated in *Williams,* § 2254(d)(1)'s "contrary to" and

-10-

"unreasonable application" clauses have independent meaning. 529 U.S., at 404-405, 120 S.Ct. 1495. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. *Id.,* at 405-406, 120 S. Ct. 1495. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. *Id.,* at 407-408, 120 S.Ct. 1495. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one. *Id.,* at 409- 410, 120 S.Ct. 1495. See also *id.,* at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

*Bell v. Cone*, 535 U.S. 685, 693-94(2002).

This Court assumes that the statements as to which a constitutional claim is being made in this Court are those made after the failed polygraph examination when Petitioner asked if he could leave. However, it is clear from the findings of the Court of Appeals that Petitioner was advised of his *Miranda* rights and had waived them. This Court assumes, as did the Court of Appeals, that Petitioner was not free to leave at that point; the examiner's instruction to him to "have a seat" could reasonably have been understood by him as restraining his liberty to leave. But the fact that any subsequent examination was custodial does not make it inadmissible – asking if one is free to leave is not an unequivocal invocation of the right to remain silent.

Petitioner's question about whether he needed an attorney is also not an unequivocal invocation of his right to counsel, particularly since the officer told him it was not his place to give advice on whether he needed a lawyer or not.

Petitioner has not demonstrated that the Court of Appeals' decision on his first assignment

of error was an unreasonable application of clearly established federal law and therefore his first

ground for relief should be denied on the merits.


## Ground Two: Admission of Hearsay Testimony


In his second ground for relief, Petitioner asserts that the trial court should have granted a

mistrial or at least a curative instruction with respect to hearsay testimony elicited from the victim's

mother.  This was the second assignment of error on direct appeal, as to which the Court of Appeals

held:

> VII. Hearsay
>
> [*P36] John's second assignment challenges the trial court's failure
> either to grant a mistrial or to give a curative instruction based on the
> state's deliberate elicitation of hearsay evidence from Nolan. Whether
> to grant a mistrial lies within the trial court's discretion. n6 "[A]
> mistrial should be declared 'only when the ends of justice so require
> and a fair trial is no longer possible.'" n7 Whether to provide a
> curative instruction also rests in the trial court's discretion. n8
>
> n6 See State v. McNeel (May 22, 1998), 1st Dist. No. C-960980,
> 1998 Ohio App. LEXIS 2220.
>
> n7 Id., quoting State v. Franklin (1991), 62 Ohio St.3d 118, 580
> N.E.2d 1, paragraph two of the syllabus.
>
> n8 See Curl v. Lane (Dec. 5, 1988), 12th Dist. No. 88-03-006, 1988
> Ohio App. LEXIS 4781.
>
> [*P37] But before we can determine whether the trial court abused
> its discretion in denying John's requests, we must first determine
> whether the contested statements were hearsay. If they were, we must
> then determine whether the statements were admissible under some
> exception. Our next task, if the statements were inadmissible, is to
> determine whether their admission was prejudicial to John. This court
> has explained, "On determining the effect of erroneously admitted

hearsay, [we] must determine whether, in the absence of the inadmissible evidence, the evidence in favor of conviction was so overwhelming that the improperly admitted evidence was harmless beyond a reasonable doubt." n9

n9 State v. Davenport (July 30, 1999), 1st Dist. No. C-980516, 1999 Ohio App. LEXIS 3469, citing State v. Sorrels (1991), 71 Ohio App.3d 162, 593 N.E.2d 313; State v. Williams (1983), 6 Ohio St.3d 281, 6 Ohio B. 345, 452 N.E.2d 1323, paragraph three of the syllabus.

[*P38]  The record demonstrates that the assistant prosecutor asked Nolan if John was the father of a fetus Shannon had previously aborted. She replied, "Yes," before John could object. The trial court sustained the objection after it was made. When the assistant prosecutor asked about Shannon's reaction to the abortion, Nolan began, "Shannon told us that they," before John objected. His objection was sustained. When the assistant prosecutor asked if Nolan had been aware of marital problems between John and Shannon, Nolan responded that Shannon had told her in March that there were problems. The trial court sustained John's objection to that statement.

[*P39]  When the assistant prosecutor asked Nolan how she was aware that there were problems, Nolan explained, "She was very unhappy. She started becoming very depressed. She would come to family get-togethers without John. She would make up the excuse that he was always working. We did realize--I did realize later he was not working. He wasn't coming home very often. He decided to move out of the home. He did so on April 13th of 2001. He moved out of their home and moved to Kentucky to live with a co-worker, and lived there approximately two months. She was just unhappy. She was very worried about money. They purchased that home a year before from us. There were bills to be paid, and John had left her with all the bills to be paid; that was something she could not do on her own, so, that's something that was really getting her more depressed and more emotional, knowing that she could lose her home." John objected, arguing hearsay. The trial court sustained his objection, but overruled his motion to strike all the testimony.

[*P40]  The assistant prosecutor asked Nolan if she was aware of where Shannon slept. Nolan responded, "Yes." When asked about which bedroom, Nolan responded, "He told me she slept * * *,"

-13-

before John interrupted with an objection. Nolan continued her statement over the objection by saying, "Shannon slept in the blue bedroom* * *." No ruling was made on the objection. Nolan explained that the blue bedroom was the only bedroom on the first floor.

 [*P41]  When Nolan subsequently started to say what Shannon had told her the last time she had called Nolan, John objected. The assistant prosecutor then asked if it was Nolan's understanding that Shannon was going to bed. John objected [**24]  and asked for a sidebar, where he moved for a mistrial. John's counsel stated that he "was concerned the prosecution is intentionally asking questions they know are improper. They are intentionally trying to elicit what any first-year law student would understand to be blatant hearsay, and they are much too experienced not to understand the prejudicial nature of their conduct, that is an intentional act, prosecution act, to put before this jury for evidence otherwise not admissible."

 [*P42]  The assistant prosecutor responded, "The State has a heavy burden here. We need to establish some timing in order to do our story. It's not so much on the truth of the matter but just to establish the procedure here." John's attorney strongly suggested that the purpose of the hearsay was to demonstrate that Shannon had gone to bed the night John murdered her, "when there's absolutely no proof."

 [*P43]   The trial court denied the motion for a mistrial, but admonished the state to "stay away from the hearsay." John then asked for a curative instruction that the jury was not to consider anything Shannon had told Nolan. The trial court refused to give the instruction because, according to the court, not everything had been offered for the truth of the matter asserted, and because "the fact a statement is made is admissible."

 [*P44]  Immediately following the sidebar, the assistant prosecutor asked Nolan what Shannon normally wore to bed, whether she wore underwear, and whether she was in the habit of going outside without underwear. These questions supported John's argument that the hearsay was elicited to support the inference that Shannon was killed in bed, and not in self-defense after she had returned home from being out.

[*P45] HN5Hearsay is an out-of-court statement made by a declarant offered in evidence to prove the truth of the matter asserted. n10 Evid.R. 803 clearly states that hearsay is not admissible unless

-14-

specifically provided for by the Ohio or United States constitutions, Ohio statutes, Ohio evidence rules, or rules prescribed by the Ohio Supreme Court. Evid.R. 801(D) explains what statements are not hearsay, and Evid.R. 803, 804, and 807 provide exceptions to the hearsay rule. For example, Evid.R. 803(3) allows a statement of a deceased victim's then-existing state of mind or emotional condition because the spontaneity of such a statement makes it more trustworthy. n11 But the testifying witness cannot provide the reasons underlying the victim's state of mind. n12 Further if a statement is being offered for some valid purpose other than its truth, it does not fall within the definition of hearsay.

n10 Evid.R. 801(C).

n11 See State v. Sutorius (1997), 122 Ohio App.3d 1, 8, 701 N.E.2d 1, citing Weissenberger, Ohio Evidence (1996) 365, Section 803.30.

n12 Id.

[*P46] None of the exceptions specifically allow hearsay testimony from a decedent's mother to "establish timing" or to "establish procedure." There is no exception to the hearsay rule that would have allowed the statements that John was the father of the previously aborted fetus, that Shannon was not happy about the abortion, and that the couple had begun having marital problems in March to be admitted for their truth. There is no exception that would have allowed evidence of the reasons underlying Shannon's then- existing emotional condition of depression, i.e., that John had left her with unpaid bills. Thus, these statements were inadmissible.

[*P47] Concluding that the discussed hearsay statements were inadmissible, we must next determine if they were prejudicial. Several of the hearsay statements by Nolan were contained in John's statement to the police. These included the fact that John had been the father of Shannon's aborted fetus (an irrelevant matter), that they had not had a good marriage, and that he had moved out of the house six month earlier. Thus, although Nolan's statements were inadmissible, they were merely duplicative, and thus not prejudicial. As for Nolan's statements that Shannon was unhappy with the abortion and that John had left her with unpaid bills, we conclude that these were harmless beyond a reasonable doubt.

[*P48] As to the statement concerning Shannon's sleeping arrangements, the transcript indicates that Nolan said that "he" told

-15-

Nolan that Shannon slept in the blue bedroom. Assuming that "he" referred to John as the speaker, the statement was not hearsay as it would have been an admission by him. n13 If we assume that it was not John, we conclude that the admission of the statement was harmless beyond a reasonable doubt. John argues that its admission corroborated the state's theory that Shannon was asleep when he attacked her and undermined his claim of self-defense--that Shannon came into his bedroom to attack him with a knife. In light of the severity of John's attack on Shannon, we conclude that the evidence in favor of conviction was so overwhelming that the admission of the statement was harmless beyond a reasonable doubt. John's claim of self-defense was undermined not by the admission of possible hearsay, but by his hitting Shannon in the head several times with a baseball bat after she had fallen on the bed from the first blow. n13 Evid.R. 801(D)(2).

 [*P49]  While it might have been the better course for the trial court to have given a curative instruction, we cannot say, in light of our conclusion that the admission of the statements was not prejudicial, that the failure to give such an instruction prejudiced John. Similarly, we conclude that the trial court did not abuse its discretion by failing to declare a mistrial. We overrule John's second assignment.

*Id.* at **20-29.

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. §2254(a); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983).   "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62 (1991).

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988); *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir. 1983); *Bell v. Arn,* 536 F.2d 123 (6th Cir., 1976); *Burks v. Egeler*, 512 F.2d 221, 223 (6th Cir. 1975). Where an evidentiary error is so

egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Bugh v. Mitchell,* 329 F.3d 496 (6th Cir. 2003), *citing Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2000).  Courts have, however, defined the category of infractions that violate fundamental fairness very narrowly.  *Bugh, quoting Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)(*quoting Dowling v. United States*, 493 U.S. 342, 352 (1990).  "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker,* 224 F. 3rd 542, 552 (6th Cir. 2000)(*quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).      A claim of abuse of discretion by a state court judge is not sufficient to state a constitutional violation.  *Sinistaj v. Burt,*  66 F.3d 804 (6th Cir. 1995).

As Respondent argues, some of the alleged hearsay statements were not hearsay at all.  (E.g., statements by Ms. Nolan that her daughter was depressed and would come to family get-togethers alone.)  Some of the alleged hearsay statements come within the exception for admissions of a party opponent (E.g., Petitioner's statement to Ms. Nolan about where the victim slept.)  On some of the hearsay which was uttered or sought to be elicited, the trial court sustained Petitioner's objections.  With respect to the elicited hearsay which was not stricken, the Court of Appeals held that it was harmless beyond a reasonable doubt because the other evidence in the case was overwhelming.

This Court agrees that the hearsay actually admitted did not render the trial fundamentally unfair.  As noted by the Court of Appeals, several of the complained-of statements were also included in Petitioner's statements to the police and thus duplicative or admissible evidence.  The cause of Shannon's depression or that she was unhappy about a previous abortion were not at all material to the case.   The Court of Appeals' decision was not an objectively unreasonable

application of clearly established federal law and therefore Petitioner's second ground for relief should be denied.

## Ground Three: Inadmissible Expert Opinion Testimony

In Ground Three, Petitioner argues that an expert opinion cannot be admitted in evidence unless it is based on facts perceived by the witness or admitted in evidence. This claim was the third assignment of error on direct appeal. It was argued there – and no additional argument is made here – solely as a matter of state evidentiary law. No federal constitutional law accepting these limits on expert opinion testimony was cited in the state courts. Thus, insofar as Petitioner is now presenting this as a federal constitutional claim, he failed to fairly present to the state courts. The claim must be "fairly presented" to the state courts in a way which provides them with an opportunity to remedy the asserted constitutional violation. *Levine v. Torvik*, 986 F.2d 1506 (6th Cir. 1993); *Riggins v. McMackin,* 935 F.2d 790 (6th Cir. 1991). If a petitioner's claims in federal habeas rest on different theories than those presented to the state courts, they are procedurally defaulted. *Lorraine v. Coyle*, 291 F.3d 416 (6th Cir. 2002), *citing Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *Lott v. Coyle*, 261 F.3d 594, 607, 619 (6th Cir. 2001)("relatedness" of a claim will not save it). Of course, if what Petitioner is asking is for this Court to review the correctness of the state court's ruling on the evidentiary question, that is beyond our habeas corpus jurisdiction.

It is therefore recommended that the third ground for relief be denied.

## Ground Four: Insufficiency of the Evidence

In his fourth ground for relief, Petitioner asserts that there was insufficient evidence to support his second aggravated murder conviction, to wit, for murdering the unborn fetus his wife was carrying at the time of her death.  This was the fourth assignment of error presented to the Court of Appeals which opined on it as follows:

IX. Sufficiency of the Evidence

[*P56]  John's fourth assignment challenges the sufficiency of the evidence supporting his conviction for aggravated murder relating to the unlawful termination of Shannon's pregnancy. Specifically he challenges the lack of medical evidence relating to Shannon's pregnancy and the lack of proof that the fetus was alive prior to Shannon's death.

[*P57]  R.C. 2903.01(A) forbids anyone from purposely and unlawfully terminating another's pregnancy with prior calculation and design. R.C. 2903.09(A) defines unlawful termination of another's pregnancy as "causing the death of an unborn member of the species homo sapiens, who is or was carried in the womb of another, as a result of injuries inflicted during the period that begins with fertilization and that continues unless and until live birth occurs." In reviewing a challenge to the sufficiency of the evidence, we must ask "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." n18

n18 State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

[*P58]  After examining Shannon and the fetus, the coroner testified that the fetus was killed due to a lack of oxygen caused by the bludgeoning death of Shannon. The coroner admitted [**35] that he did not know for certain that the fetus had been alive immediately before Shannon was killed, but he testified that he had no evidence that it had been dead either. John challenges the cause of death because there was no direct evidence that the fetus was alive immediately before John killed Shannon. This is due, in part, to the inability of the coroner to perform an autopsy on the fetus because it had skeletonized before John told the authorities where Shannon's body was located.

-19-

[*P59]  But the causal link between the fetus's death and John's conduct could be proved by evidence other than the coroner's testimony. n19 While it would have been better for the state to have provided the most recent medical evidence of the condition of Shannon's fetus, that evidence would not have addressed the issue John raises--was the fetus alive at the moment John attacked Shannon? The most recent medical evidence would not have directly provided the answer. Only Shannon knew whether the fetus was alive and moving at that moment, and she was not alive to testify. The only other means of ascertaining whether the fetus was alive at that time would have required that Shannon be connected to a fetal monitor with a qualified person reading its output as she was being killed. Thus, the jury had to rely on circumstantial evidence. This it could have done. HN10Circumstantial evidence and direct evidence are of equal evidentiary value, especially because some facts can only be proved by circumstantial evidence. n20

n19 Accord State v. Beaver (1997), 119 Ohio App.3d 385, 392, 695 N.E.2d 332; State v. Avery (June 8, 1999), 7th Dist. No. 96 CA 33, 1999 Ohio App. LEXIS 2643.

n20 State v. Jenks, 61 Ohio St.3d at 272.

[*P60]  There is substantial circumstantial evidence in the record that the fetus was living before Shannon was murdered. The coroner testified that Shannon's fetus was consistent with a five-month gestation period. John told the police that Shannon had been five month's pregnant. From this the jury could have inferred that the fetus had been alive for five months.

[*P61]  John asked whether his killing of the baby would give rise to an additional charge. Obviously, John believed the fetus was alive. Shannon was preparing for the arrival of the child a few days before she was murdered. The night before she was murdered, her mother informed her that she had bought maternity clothes for Shannon. One month earlier, Shannon had been informed by medical personnel that the baby was a girl. She had chosen a name for the baby. She had a doctor's appointment the day after she was murdered. We conclude that the evidence was sufficient to convict John. We overrule his fourth assignment.

*Id*. at **33-37.

An allegation that a verdict was entered upon insufficient evidence states a claim under the

Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358  (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6ᵗʰ Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6ᵗʰ Cir. 1990)(en banc).  In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . .  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319.  This rule was adopted as a matter of Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E. 2d 492 (1991)³.  Of course, it is state law which determines the elements of offenses;  but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt.  *In re Winship, supra.*

The analysis of the Court of Appeals is correct.  Anytime an unborn fetus is killed by killing the mother, the evidence that it was alive immediately before the mother was killed must of necessity be circumstantial.  The question must be whether the cumulative circumstantial evidence, construed in a light most favorable to the State, could support a finding beyond a reasonable doubt.  There were admissions from Petitioner that his wife was five months pregnant and that he believed he had killed the baby.  The fetus was five months old, according to the coroner.  It is a reasonable inference from the fact that Shannon had a doctor's appointment the next day that she believed the

---

³The Court of Appeals cited *Jenks,* which embodies the federal constitutional standard, as the controlling law.

baby to be alive on the date of her murder and her belief is circumstantial evidence that the baby was alive. All of this evidence, along with the coroner's testimony, was sufficient to permit a conclusion beyond a reasonable doubt. The fourth ground for relief is without merit.

## Ground Five: Prosecutorial Misconduct

In his fifth ground for relief, Petitioner claims that misconduct by the prosecutor deprived him of a fair trial. This was his fifth assignment of error on direct appeal and the Court of Appeals wrote:

> X. Prosecutorial Misconduct
>
> [*P62]  In his fifth assignment, John alleges that the trial court erred to his prejudice by denying his motion for a mistrial in response to repeated acts of prosecutorial misconduct. He first incorporates the arguments he made in his second assignment. We have answered those arguments by overruling his second assignment.
>
> [*P63]  He also argues that the trial court should have granted a mistrial or provided a curative instruction when the assistant prosecutor informed the jury in closing argument that the defense had requested that the jury be instructed on self-defense and voluntary manslaughter. No objection was made at this point.  Later, the assistant prosecutor argued that the jury would hear an instruction on voluntary manslaughter made at the defense's request. John moved for a mistrial, arguing that it was highly improper for the state to inform the jury that John had requested the voluntary manslaughter and self-defense instructions. The trial court denied the motion and admonished the assistant prosecutor not to "mention it again."
>
> [*P64]  A motion for a mistrial rests in the court's discretion, and should be granted "only when the ends of justice so require and a fair trial is no longer possible." n21 In viewing a claim of prosecutorial misconduct, we must determine whether the prosecutor's remarks were improper, and if so, whether they prejudicially affected the defendant's substantial rights. n22 If it is clear beyond a reasonable

-22-

doubt that absent the offending comments the defendant would have been found guilty, the comments are harmless. n23 Thus, if the prosecutor's comments were improper and prejudicially affected John's substantial rights, a mistrial should have been granted.

n21 State v. Franklin (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1.

n22 See State v. Smith, 87 Ohio St.3d 424, 442, 2000 Ohio 450, 721 N.E.2d 93.

n23 See State v. Smith (1984), 14 Ohio St.3d 13, 15, 14 Ohio B. 317, 470 N.E.2d 883.

[*P65] We conclude that it was improper for the state to attribute the instructions to John. n24 A requested instruction is not given as an instruction of a party, but is tendered "as an instruction of the court itself and becomes the law of the case." n25 To attribute it to a party "is likely to indicate to the jury that it is not as much an instruction of the court as are other parts of the court's charge." The error was harmless, however, because the evidence was such that John would have been found guilty absent the assistant prosecutor's comments. We overrule John's fifth assignment.

n24 See State v. Ritchie (July 25, 1997), 2nd Dist. No. 15792, 1997 Ohio App. LEXIS 3421; State v. Chinn (Dec. 27, 1991), 2nd Dist. No. 11835, 1991 Ohio App. LEXIS 6497; Columbus v. Bee (1979), 67 Ohio App.2d 65, 425 N.E.2d 404, 425 N.E.2d 409.

n25 Columbus v. Bee, 67 Ohio App.3d at 80, quoting State v. Stanton (1968), 15 Ohio St.2d 215, 216, 239 N.E.2d 92.

*Id*. at **37-40.

On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process, *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainright*, 477 U.S. 168 (1986); *Kincade v. Sparkman*, 175 F.3d 444 (6th Cir. 1999) or whether it was "so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir. 1979); accord *Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979), *aff'd sub nom*,

*Watkins v. Sowders*, 449 U.S. 341 (1981); *Stumbo v. Seabold*, 704 F.2d 910 (6th Cir. 1983).  To decide this question, the court must first decide whether the complained-of conduct was in fact improper. *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), *citing United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).  A four-factor test is then applicable to any conduct the Court finds inappropriate: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and whether the evidence against the defendant was strong." *Id.*  The court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982).  The court must examine the fairness of the trial, not the culpability of the prosecutor. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993)(quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In *Serra*, the Sixth Circuit identified factors to be weighed in considering prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.,* at 1355-56 (quoting *Angel*, 682 F.2d at 608).  The misconduct must be so gross as probably to prejudice the defendant. *Prichett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 572 (1997); *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988).

The first claimed act of prosecutorial misconduct was the deliberate eliciting of hearsay testimony from the victim's mother.  This Court finds the behavior to have been misconduct: while the degree of experience of the assistant county prosecutor is not shown by the record, some of the

-24-

attempts at eliciting hearsay which he made would have been obviously improper to anyone who had studied the hearsay rule in law school. The fact that he continued in his attempt after being warned at the bench supports that conclusion. However, for the reasons set forth above with respect to the second ground for relief, the misconduct was prejudicial to the Petitioner's right to a fair trial.

The second claimed act of misconduct was advising the jury that they would hear instructions on self-defense and voluntary manslaughter because the Petitioner had requested them. The Court of Appeals found that the attribution of the instructions to Petitioner was improper because instructions actually given by the judge become the instructions of the court. Nevertheless, it found the error harmless.

This Court finds that any impropriety in the prosecutor's comment was minimal. His statement that these instructions were requested by Petitioner was truthful and hardly prejudicial: the jury must certainly have known that Petitioner was the one claiming self-defense and would not have been somehow misled by learning he had requested the voluntary manslaughter instruction. Moreover, any possible prejudicial effect could have been easily overcome by requesting a curative instruction, which Petitioner's counsel did not do. A mistrial under these circumstances would have been a vast overreaction. In addition, the evidence of Petitioner's guilt was strong.

The Court concludes that the state court's decision was not an unreasonable application of clearly established federal law. Therefore the fifth ground for relief is without merit.

**Ground Six: Ineffective Assistance of Counsel**

In his sixth ground for relief, Petitioner asserts he was denied the effective assistance of counsel by his attorney's performance in closing argument and with respect to jury instructions. With respect to these claims, the Court of Appeals held as follows:

XI. Ineffective Assistance of Counsel

[*P66] In John's sixth assignment, he contends that he was denied the effective assistance of counsel. To prevail on his claim, John "must show that counsel's representation fell below an objective standard of reasonableness," n26 and that he was prejudiced by counsel's deficient performance. n27 Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." n28 If the defendant fails to prove one of the prongs, we need not consider the other. n29

n26 See Strickland v. Washington (1984), 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

n27 See id. at 687.

n28 Id. at 694.

n29 See id. at 697.

[*P67] John claims that trial counsel was ineffective for erroneously (1) objecting to the state's comments that John had the burden of production and proof on the issues of self-defense and the "sudden passion or fit of rage" component of voluntary manslaughter, and (2) telling the jury that John did not have to prove anything. John also complains that counsel was ineffective for failing to object when the trial court erroneously instructed the jury that he had a duty to retreat when there was no such duty under the facts of this case.

XII. Misunderstanding of Burden of Proof

[*P68] In response to the state's closing argument that John had to prove self-defense and voluntary manslaughter, John's counsel said, "And I do not have to prove self-defense, and I do not have to prove involuntary manslaughter, and I make no apology for it. I will tell you the bottom line: If he wants a conviction for aggravated murder,

he has to prove that my client had a prior calculation and design, that he had a scheme. He has to have a plan. He has to have proof for it, instead of speculation, instead of wild insinuation." The assistant prosecutor subsequently argued that John's counsel was wrong when he said that he did not have to prove voluntary manslaughter and self-defense.  At that point, John's counsel interrupted and asked for a sidebar conference. He objected to the prosecution's statement that he had an obligation to prove anything on behalf of John. He said that he had no burden to go forward with anything. The trial court overruled the objection, stating that John did have the burden to prove self-defense.

[*P69]  But for the sidebar conference, we would have concluded that what defense counsel was arguing, albeit inartfully, was that the state had the burden to prove that John had a plan and that John did not have the burden to negate any of the elements of the charged offenses. But the sidebar conference made it clear that counsel really believed that he had no burden to prove self-defense or voluntary manslaughter. This was incorrect. John had the burden of persuading the jury, by a preponderance of the evidence, that he had acted under the influence of sudden passion or in a sudden fit of rage that was brought on by serious provocation from Shannon that was reasonably sufficient to incite him into using deadly force. n30 Furthermore, John had the burden to prove each element of self-defense by a preponderance of the evidence. n31 Thus,  for counsel to have stated that he had no burden to prove voluntary manslaughter or self-defense constituted deficient performance.

n30 See State v. Rhodes (1992), 63 Ohio St.3d 613, 590 N.E.2d 261, syllabus.

n31 See State v. Martin (1986), 21 Ohio St.3d 91, 21 Ohio B. 386, 488 N.E.2d 166, syllabus.

[*P70]  We must next determine whether there is a reasonable probability that, but for counsel's incorrect understanding of the law, the result of John's trial would have been different. As to the effect on the jury, the trial court correctly charged the jury that John had the burden of proving that he had knowingly acted under the influence of sudden passion or a sudden fit of rage and that he had acted in self-defense. It also instructed the jury that closing arguments were not evidence. Further, we have not been directed to anything to suggest that the jury did not follow the trial court's instructions. Because the jury is presumed to have followed the instructions given

-27-

by the trial court, n32 John has not demonstrated prejudice as to the effect of counsel's deficient performance concerning the jury instructions.

n32 See State v. Stallings, 89 Ohio St.3d 280, 286, 2000 Ohio 164, 731 N.E.2d 159.

[*P71]    We must also determine whether his counsel's misunderstanding of the law prejudiced John in how counsel presented evidence on these issues. We first note that counsel was limited by the confession that John had given to the police. Counsel presented evidence that Shannon attacked John and that he responded by swinging a bat to stop her attacks. According to John's interpretation of the evidence, Shannon returned home, intoxicated, and became angry because he had had sexual intercourse with another woman in the house. Shannon followed him into his bedroom, after getting a kitchen knife. When she jabbed at him with the knife, he warned her to stop, jumping on the bed and switching places with Shannon. He grabbed a bat from the dresser. He pushed Shannon away twice before swinging the bat in an attempt to hit Shannon's shoulder. Instead, he hit her head. His theory was that this was a domestic dispute that got out of control.

[*P72]  The trial court concluded that the evidence was sufficient to warrant instructions on voluntary manslaughter and self-defense. The jury was provided with the opportunity to consider these issues. We conclude that, in spite of counsel's mistaken view of the law, John was not prejudiced.

XIII. Erroneous Self-Defense Instruction

[*P73]  John next argues that trial counsel was ineffective because counsel failed to object to that part of the self-defense charge that John had a duty to retreat from his home before using lethal force. The trial court instructed, in part, "The defendant had a duty to retreat if the defendant was at fault in creating the situation, or the defendant did not have reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm and that his only means of escape from that danger was by the use of deadly force." The instruction was erroneous. There is no duty to retreat from one's home.

[*P74] In Ohio, to justify killing in self-defense,  a defendant must prove that he (1) was not at fault in creating the violent situation, (2)

had a bona fide belief that he was in danger of death or great bodily harm and the only way to escape was by using force, and (3) did not violate any duty to retreat or avoid the danger. n33 Further, "there is no duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home." n34 The trial court simply misunderstood the law of self-defense. We have seen this error before. n35

n33 See State v. Thomas, 77 Ohio St.3d 323, 326, 1997 Ohio 269, 673 N.E.2d 1339.

n34 Id. at 328. See, also, State v. Cassano, 96 Ohio St. 3d 94, 2002 Ohio 3751, 772 N.E.2d 81.

n35 See, e.g., State v. Miller, 149 Ohio App.3d 782, 2002 Ohio 5812, 778 N.E.2d 1103; In re Maupin (Dec. 11, 1998), 1st Dist. No. C-980094, 1998 Ohio App. LEXIS 5907.

[*P75] We next must ask whether, but for the instruction to the jury that John had a duty to retreat, the trial's outcome have been different. The compelling evidence of John's guilt eliminates the possibility of prejudice. The jury would have rejected his theory of self- defense even had it been instructed that John had no duty to retreat. n36 While one blow to Shannon's head may have constituted self-defense, the next several blows John rendered to Shannon's head while she was attempting to rise from the bed removed John's action from being defensive. We overrule John's sixth assignment.

n36 Accord State v. Roberts (2000), 139 Ohio App.3d 757, 764, 745 N.E.2d 1057.

*Id*. at **40-47.

As noted by the Court of Appeals, the governing standard for effective assistance of counsel

is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the

> deficient performance prejudiced the defense. This requires showing
> that counsel's errors were so serious as to deprive the defendant of a
> fair trial, a trial whose result is reliable. Unless a defendant makes
> both showings, it cannot be said that the conviction or death sentence
> resulted from a breakdown in the adversary process that renders the
> result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential.
> . . . A fair assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and
> to evaluate the conduct from counsel's perspective at the time.
> Because of the difficulties inherent in making the evaluation, a court
> must indulge a strong presumption that counsel's conduct falls within
> a wide range of reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be considered sound trial
> strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that,
> but for counsel's unprofessional errors, the result of the proceeding
> would have been different. A reasonable probability is a probability
> sufficient to overcome confidence in the outcome.

466 U.S. at 694. *See also Darden v. Wainright*, 477 F.2d 168 (1986); *Wong v. Money,* 142 F.3d 313,

319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). *See generally* Annotation,

26 ALR Fed 218.

Petitioner's counsel did, in closing argument, misstate the burden of proof on self-defense

and on the elements needed to reduce murder to manslaughter. However, there was no likely

prejudice from those misstatements: counsel had undertaken to place in evidence the testimony

-30-

needed to prove those two defenses and the judge had correctly stated the burden of proof.  Next, the trial court did misstate the duty to retreat and Petitioner's counsel failed to object.  Again, there was no likely prejudice as Petitioner's self-defense argument was very weak in light of his admission about how many times he hit his wife in the head with the baseball bat and his claim that he had returned the knife with which she supposedly threatened him to the kitchen.

Thus, while Petitioner has shown several deficiencies in the performance of his trial counsel, he has not shown that, but for these deficiencies, the outcome would likely have been different.  The Court of Appeals' decision is not an unreasonable application of clearly established federal law and therefore Petitioner's sixth ground for relief is without merit.

### Conclusion

In accordance with the foregoing analysis, it is respectfully recommended that the Petition for Writ of Habeas Corpus be dismissed with prejudice.

September 20, 2006.

s/ Michael R. Merz
Chief United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections

shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

H:\DOCS\Broe v. Moore 01.wpd